VERIFICATION OF TRANSLATION


I, R. Radzai,

of    Newtype Communications, Inc.
      445 Fifth Avenue
      New York
      NY 10016
      United States of America



declare as follows:

1.    That I am well acquainted with both the English and German
      languages, and

2.    That the attached document is a true and correct translation made
      by me to the best of my knowledge and belief of:

      Complaint in the matter of OSRAM Opto Semiconductors GmbH
                  vs.
      Citizen Electronics Co, Ltd.
                  and
      Endrich Bauelemente Vertriebs GmbH


      _____11/08/05_____
Date                                  Signature of Translator

**BAKER & McKENZIE**

[letterhead information]

[stamp] **Copy**

Regional Court of Dusseldorf
4th Civil Chamber

40002 Dusseldorf

14 March 2005

# Complaint

In the matter of

OSRAM Opto Semiconductors GmbH, represented by its managing directors, Dr. Rüdiger Müller, Robert Wittgen, and Klaus Regitz, Wernerwerkstrasse 2, 93049 Regensburg

(plaintiff)

represented in this action by: Dr. Günther Pickrahn, Baker & McKenzie LLP, Bethmannstrasse 50-54, 60311 Frankfurt am Main

vs.

1. Citizen Electronics Co, Ltd., 1-23-1 Kamikurechi, Fujiyoshida-shi, Yamanashi-ken 403-0001, Japan, represented by its president, Mr. Takashi Masuzawa

(respondent 1)

2. Endrich Bauelemente Vertriebs GmbH, represented by its managing directors, Mr. Wolfgang Endrich and Mrs. Ursula Endrich, Haupstr. 56, 72202 Nagold

(respondent 2)

for: patent and utility model infringement
tentative value of the action: EUR 5,000,000.00

1

**BAKER & McKENZIE**

We bring a complaint in the name and on order of the plaintiff. We make the following motions:

1.  Let the respondents be ordered,

    under pain of an administrative fine of up to EUR 250,000.00 due for every instance of the violation, as a substitute for incarceration of up to 6 months, or incarceration of up to 6 months, in repeat violations up to 2 years, to refrain

    (1) from offering, placing in commerce or using, or either importing or possessing for the stated purposes

    light-emitting semiconductor components with a semiconductor body, which emits electromagnetic radiation during the operation of the semiconductor component, with at least a first and at least a second electrical terminal, which are connected in electrically conducting manner to the semiconductor body, and with a luminescence conversion element, which has at least one luminescent material,

    wherein the semiconductor body has a sequence of semiconductor layers that is suited to emitting electromagnetic radiation of a first wavelength region from the ultraviolet, blue and/or green spectral region during the operation of the semiconductor component, the luminescence conversion element transforms a radiation coming from the first wavelength region into radiation of a second wavelength region, different from the first, and lets through at least a part of the electromagnetic radiation of the first wavelength region, so that the semiconductor component emits a mixed radiation consisting of radiation of the first wavelength region and radiation of the second wavelength region, and wherein the luminescence conversion element contains light-scattering particles in addition to the luminescent material (claim 1 of DE-GM 29 724 847),

    and

    the luminescence conversion element has at least one inorganic luminescent material from the group of the phosphors (claim 14 of DE-GM 29 724 847),

    and

    the inorganic luminescent material is embedded in an epoxy resin matrix (claim 17 of DE-GM 29 724 847),

    especially when

    the luminescence conversion element is arranged essentially after the semiconductor body, looking in the principal direction of radiation of the semiconductor component (claim 3 of DE-GM 29 724 847),

    especially when

    the second wavelength region(s) have at least in part larger wavelengths $\lambda$ than the first wavelength region (claim 6 of DE-GM 29 724 847),

    especially when

2

the first wavelength region and the second wavelength region of the mixed radiation lie at least partly in mutually complementary spectral color regions, so that white light is produced (claim 8 of DE-GM 29 724 847),

especially when

the radiation emitted by the semiconductor body has an intensity maximum at a wavelength $\lambda \leq 520$ µm (claim 10 of DE-GM 29 724 847),

especially when

the inorganic luminescent material is from the group of the Ce-doped garnets (claim 15 of DE-GM 29 724 847),

(2)     from offering, placing in commerce or using, or either importing or possessing for the stated purposes

light-emitting semiconductor components

with a wavelength-converting casting compound based on a transparent epoxy resin for an electroluminescing component with a body emitting ultraviolet, blue and/or green light, wherein an inorganic luminescent pigment powder with luminescent pigments from the group of the phosphors with general formula $A_3B_5X_{12}$:M is dispersed in the transparent epoxy resin and the luminescent pigments have grain sizes $\leq 20$ µm and a mean grain diameter $d_{50} \leq 5$ µm, and

with a semiconductor body that emits electromagnetic radiation during the operation of the semiconductor element,

wherein the semiconductor body has a sequence of semiconductor layers that is suited to emitting electromagnetic radiation from the ultraviolet, blue and/or green spectral region during operation of the semiconductor component, and the luminescent pigments transform a portion of the radiation coming from this spectral region into radiation with larger wavelength, so that the semiconductor component emits mixed radiation, especially mixed color light, consisting of this radiation from the ultraviolet, blue and/or green spectral region (claim 21 of EP 0 862 794 and claim 13 of DE-GM 297 24 382)

especially when

the casting compound encloses at least a part of the semiconductor body (claim 22 of EP 0 862 794 and claim 14 of DE-GM 297 24 382)

(3)     from offering, placing in commerce or using, or either importing or possessing for the stated purposes

light-emitting semiconductor components with a semiconductor body, which emits electromagnetic radiation during the operation of the semiconductor component, with at least a first and at least a second electrical terminal, which are

BAKER & MCKENZIE

connected in electrically conducting manner to the semiconductor body, and with a luminescence conversion element, which has at least one luminescent material,

wherein the semiconductor body has a sequence of semiconductor layers that is suited to emitting electromagnetic radiation of a first wavelength region from the ultraviolet, blue and/or green spectral region during the operation of the semiconductor component, the luminescence conversion element transforms a radiation coming from the first wavelength region into radiation of a second wavelength region, different from the first, and lets through at least a part of the electromagnetic radiation of the first wavelength region, so that the semiconductor component emits a mixed radiation consisting of radiation of the first wavelength region and radiation of the second wavelength region, and wherein a path length of the electromagnetic radiation of the first wavelength region emitted by the semiconductor body is approximately the same for all radiation directions through the luminescence conversion element (claim 1 of DE-GM 297 24 848),

and

the luminescence conversion element has at least one inorganic luminescent material from the group of the phosphors (claim 14 of DE-GM 297 24 848),

and

the inorganic luminescent material is embedded in an epoxy resin matrix (claim 17 of DE-GM 297 24 848),

especially when

the luminescence conversion element is arranged essentially after the semiconductor body, looking in the principal direction of radiation of the semiconductor component (claim 3 of DE-GM 297 24 848),

especially when

the second wavelength region has at least in part larger wavelengths $\lambda$ than the first wavelength region (claim 6 of DE-GM 297 24 848),

especially when

the first wavelength region and the second wavelength region of the mixed radiation lie at least partly in mutually complementary spectral color regions, so that white light is produced (claim 8 of DE-GM 297 24 848),

especially when

the radiation emitted by the semiconductor body has an intensity maximum at a wavelength $\lambda \leq 520$ nm (claim 10 of DE-GM 297 24 848),

especially when

**BAKER & McKENZIE**

the inorganic luminescent material is from the group of the Ce-doped garnets (claim 15 of DE-GM 297 24 848),

especially when

the luminescence conversion element has light-scattering particles (claim 22 of DE-GM 297 24 848).

2.    Let the respondents be ordered

to make a reckoning to the plaintiff as to the extent to which the respondents have engaged in the actions designated under 1, and this in regard to the following bill of particulars with the respective indicated dates:

Count 1 (1): from 4 December 2004 on

Count 1 (2): from 9 October 1998 on

Count 1 (3): from 4 December 2004 on

indicating

a)   the individual deliveries, broken down by delivery quantities, delivery times and delivery prices, as well as the names and addresses of the customers,

b)   the individual offers, broken down by offer quantities, offer times and offer prices, as well as the names and addresses of the recipients of the offers,

c)   the advertising done, broken down by advertising media, the size of the print run, the period of distribution and the distribution territory,

d)   the original costs, broken down by individual cost factors, and the profit gained, which should not have the fixed costs or variable overhead expenses subtracted from it, unless these can be assigned, in exceptional manner, directly to the products indicated under 1 above,

wherein the right is reserved to the respondents to communicate the names and addresses of the noncommercial customers and recipients of offers not to the plaintiff, but rather to a certified auditor, designated by the latter and pledged to secrecy with regard to the latter, as long as the respondents bear the costs and authorize and obligate him to inform the plaintiff, when specifically asked, whether a particular customer or offer recipient appears in the listing.

3.    Let the respondents be ordered

to hand over the products in direct or indirect possession or ownership of the respondents, in keeping with 1 above, to a bailiff to be commissioned by the plaintiff for purposes of their destruction at the expense of the respondents.

**BAKER & MCKENZIE**

4.    Let it be found that the respondents are jointly and severally liable to reimburse the plaintiff for all damages incurred by it and yet to be incurred from the actions designated under 1 and committed in the following designated times, namely

Count 1 (1): from 4 December 2004 on

Count 1 (2): from 25 February 2001 on

Count 1 (3): from 4 December 2004 on

5.    Let it be found that the respondents are jointly and severally liable to pay the plaintiff a suitable indemnification for the actions designated in count 1 (2) of the complaint and committed in the period from 9 October 1998 up to and including 25 February 2001.

**Grounds:**

**I.    The parties**

1.    The plaintiff belongs to the OSRAM Group, one of the biggest lighting concerns in the world. It develops and markets, in particular, light diodes (light-emitting diodes, LEDs), which are the subject of German utility models DE 297 24 847, DE 297 24 382 and DE 297 24 848 (hereinafter, "complaint utility models"), as well as European patent EP 0 862 794.

We enclose – in triplicate for the court – a copy of the complaint utility model DE 297 24 847 (hereinafter, "complaint utility model I") as

**BAKER & McKENZIE**

**Exhibit K 1**

Complaint utility model 1 was split off from the European patent with application number 97931666.8 and submitted on 30 September 2004. The submittal was published on 4 November 2004.

We are enclosing – in triplicate for the court – a copy of the complaint utility model DE 297 24 382 (hereinafter, "complaint utility model II") as

**Exhibit K 2a**

Complaint utility model II was split off from the European patent EP 0 862 794 and submitted on 21 December 2000. The submittal was published on 25 January 2001. We are enclosing – in triplicate for the court – a copy of the European patent 0 862 794 (hereinafter, "complaint patent"), granted on 27 November 2002, as

**Exhibit K 2b**

Finally, we are submitting – in triplicate for the court – a copy of the complaint utility model DE 297 24 848 (hereinafter, "complaint utility model III") as

**Exhibit K 3.**

Complaint utility model III – like complaint utility model I - was split off from the European patent with application number 97931666.8 and submitted on 30 September 2004. The submittal was published on 4 November 2004.

The complaint utility models as well as the complaint patent are in effect.

**Proof**: Communication from the German Patent and Trademark Office.

2.      The respondent 1 makes and markets LEDs which emit white light. The respondent 2 is a dealer, which among other things also sells the LEDs of the respondent 1. Thus, in February 2004, it supplied to a colleague of the plaintiff, among other things, 5000 LEDs of type CL-270WA-D-TS of the respondent 1.

**Proof**:  1.      Invoice of the respondent 2 for the supply of LEDs of respondent 1 dated 9 February 2004, enclosed in copy as **Exhibit K 4**.

2.      Sample of LED of type CL-270WA-D-TS of the respondent 1, enclosed as **Exhibit K 5**.

## II.      Technical background of the protected rights of the complaint

All the protected rights of the complaint pertain to light-emitting semiconductor components with a radiation-emitting semiconductor body and a luminescence conversion element. This group of semiconductor components also includes the light diode components (LED – light emitting diode), which possess as the radiation emitting semiconductor body a light diode chip (LED chip), which emits light of a particular spectral color. A luminescence conversion element according to the teaching of the protected rights of the complaint is an encasing compound, preferably consisting of transparent resin, to which a luminescent material is added. This luminescent material absorbs light of a particular wavelength region and is thereby itself stimulated to shine. The light emitted by the stimulated luminescent material comes from a longer-wave

**BAKER & McKENZIE**

region than the absorbed light of the light diode chip and therefore the light is of a different spectral color than the light of the light diode chip.

For a better understanding of the terms "luminescence" and "luminescent material" we are enclosing, as

**Exhibits K 6 and K 7**

two excerpts from DER BROCKHAUS, Naturwissenschaft und Technik [The Brockhaus Encyclopedia of Science and Technology], Vol. 2, 1st ed., 2003. Here, in particular, it is explained that the phenomenon of luminescence of luminescent materials is material-specific and can also be triggered by electromagnetic radiation, such as is produced from a LED chip.

LEDs today are indispensable to modern lighting engineering. As compared to traditional incandescent bulbs, LEDs have the advantage of using less current and having a much longer lifetime. They are used not just for backlighting of displays, such as in cell phones or for dashboard lighting. Increasingly, LEDs are also serving as a pure lighting source, such as the headlights of motor vehicles.

In all these applications, especially in general lighting engineering, there is a special effort to employ white light. However, white light can only be achieved as a mixture of light of different color. Thus, for example, a suitable mixture of red, green and blue light produces white mixed light. We refer here to the CIE diagram submitted as

BAKER & McKENZIE

**Exhibit K 8**

This color diagram, also known as a chromatic diagram, includes all colors perceptible to man at a constant brightness step. The 100 percent pure colors of the spectrum lie on the curved part of the margin. A standardized white light is marked by a point in the middle. One also calls this point the achromatic point. The colors of the spectrum are arranged in horseshoe fashion around this absolute white point. Each point within the horseshoe represents a chromaticity. For example, if the chromaticities A and B are available for a mixed color, then one can only produce those chromaticities by color mixing that lie on the straight connection line between chromaticity A and chromaticity B. Accordingly, white light can only be mixed from two chromaticities if the straight connection line passes through the white region of the CIE diagram. White light can be mixed from blue and yellow light, for example, but not from blue and green light.

The actual light source of a LED is the so-called LED chip. This consists of a semiconductor, which emits light from the visible spectrum when it is stimulated by an operating current. The color of the light emitted by the semiconductor is dependent on the material system and the special configuration of the sequence of layers of the semiconductor body that generates the radiation.

One characteristic of every LED chip is that it can always only emit light of a single spectral color, depending on its basic semiconductor material.

According to a common technical method at the priority date of the protected rights of the complaint, in order to make a LED which could emit white light one would employ three LED chips of different color (blue, green and red) in a common LED housing. Due

to the need for three LED chips, this in itself represented a very costly technical method, especially since the three LED chips because of different semiconductor material systems required different actuation voltages and currents. Moreover, because of different aging properties of the different LED chips, there would be unwanted changes in the white tone produced by the LEDs.

One approach known from the state of the art, to use light diodes of a single color to realize a planar light source, especially for back-lighting of displays with white light, is proposed in Japanese patent application JP-07 176 794 A. Here, a LED component emitting a blue light is coupled sideways to a light guide plate, so that the blue light of the LED component is totally reflected by the two primary surfaces of the light guide plate, situated opposite one another, and the blue light of the LED component is distributed over the entire surface of the light guide plate.

A scatter plate is arranged at the light-emitting front side of the light guide plate, through which the light exits from the arrangement and used as background lighting. On the back side of the light guide plate there is applied a fluorescent light-scattering substance, consisting of a mixture of fluorescent particles and white pigments. The fluorescent light-scattering substance converts the blue light of the LED component and scatters this converted light to the light-emitting front side of the light guide plate, where it can exit. The fluorescent light-scattering substance is imprinted on the back side of the light guide plate in the form of gridlike conversion points, employing the fluorescent light-scattering substance as an ink in which the fluorescent particles and light-scattering pigments are mixed. Blue light penetrating into these conversion points is converted by the fluorescent particles and scattered by means of the white pigments. Organic fluorescent pigments are specified as the fluorescent substance.

BAKER & McKENZIE

Furthermore, a reflecting plate is provided at the back side of the light guide plate, which reflects the light that reaches the back side of the light guide plate to the front side of the light guide plate. At the same time as the light converted by the conversion points, blue light of the LED component also exits through the front side. The blue light of the LED component and the converted light of the conversion points are then mixed to the desired white mixed light by the scatter plate, arranged after the front side of the light guide plate.

This arrangement is especially suited, first, to distributing the blue light emitted by the LED over a rather large surface, as is required for the background lighting of a display, and second, to transforming a portion of the blue light, so that white light is produced as mixed light.

A special advantage of this arrangement, according to the mentioned publication, is that the fluorescent substance does not stand in direct contact with the LED chip, so that the degradation (worsening) of the fluorescent substance should be slight and a change in the chromaticity of the planar light source over a lengthy time should be prevented.

The ambition of generating uniform white light is in fact achieved, according to JP-07 176794 A, in that the conversion does not take place in the LED component itself, but over a large surface away from the LED component.

However, the following problems arise. The light emitted by the scattering glass pane on the front side is composed of many components: namely, (1) blue light, which reaches the scattering glass pane directly from the blue LED, (2) blue light that was reflected by the back side of the light guide plate, (3) blue light which has gone through the conversion

BAKER & McKENZIE

points to reach the reflecting plate, where it is reflected and then reaches the scattering glass pane, and (4) converted light, produced in the conversion points from the blue light penetrating there and returning upward to the scattering pane. The quantitative fractions of the mentioned light components can be influenced by the physical parameters of the materials used, as well as the makeup of the arrangement. Only with an optimal configuration of all parameters do the various light components come together in such a way that white light is recognizable to an observer. However, this simultaneous optimization of all parameters, which at least partly interact with each other, is difficult. It is especially difficult to apply the fluorescent substance so exactly that outwardly homogeneous light is emitted. Furthermore, the reproducibility in mass production causes major problems, because even slight fluctuations in layer thicknesses of the fluorescent conversion points, due for example to unevenness in the surface of the transparent plate, produce a change in the white tone of the light emitted. Likewise, fluctuations in the radiating angle of the LED component, such as occur in mass production, or squinting LED components, result in inhomogeneities in the mixed light emitted due to different light distributions in the light guide plate. The arrangement shown, furthermore, has a considerable footprint, which is not consistent with the desire for ever increasing miniaturization of electronic devices.

Therefore, a great desire existed to develop LED components which already themselves emit white light in a technically simple manner, by means of a single LED chip or by means of LED chips of a single color. It should also be possible to produce such LED components in large series and, therefore, as simple and economical as possible.

**BAKER & MCKENZIE**

To solve this technical problem, the protected rights of the complaint teach how to mask the LED chip inside the LED component housing with a luminescence conversion element that

- absorbs a portion of the radiation emitted by the LED chip ("primary radiation"), thereby becoming itself stimulated to shine and emitting light of another color ("secondary radiation"),

- lets through another portion of the radiation emitted by the LED chip (i.e., primary radiation) without absorbing it,

- mixes secondary radiation and primary radiation, and

emits mixed light consisting of secondary radiation and primary radiation.

An observer perceives the light emitted by such a masked LED chip as a mixture of primary and secondary radiation. In order to achieve white light, one must select a luminous material that generates a secondary radiation, which in combination with the primary radiation of the semiconductor chip produces white (mixed) light. It is important for the perception of this mixed light as homogeneous white light that the mixed light appear in the same white tone from different viewing directions of the observer.

**III.    Violation of the complaint utility model I**

1.  Complaint utility model I

The complaint utility model I is based on the above-described technical teaching of transforming a primary radiation of the semiconductor chip partially into secondary

radiation by using a luminescence conversion element mixed with a luminous material. Its underlying problem is to produce a semiconductor chip which emits homogeneous mixed-color light. This is preferably white mixed light. The teaching of the complaint utility model I aims in particular at optimizing the perceived color and the radiation characteristics of a semiconductor component with a luminescence conversion element (Exhibit K1, page 10, lines 7 to 14).

According to the invention, the luminescence conversion element is configured such that it transforms a portion of the primary radiation (radiation of a first wavelength region) by means of the luminous material into secondary radiation (radiation of a second wavelength region). At the same time, however, it also lets through a portion of the primary radiation, so that the human eye perceives a mixture of primary radiation and secondary radiation. Now, in relation to this luminescence conversion element, the complaint utility model I teaches, in particular, how to provide it with light-scattering particles (diffusers), in addition to the luminous material, and how to select the luminous material from the group of the phosphors. Thus, the luminescence conversion element according to the teaching of the complaint utility model I contains light-scattering particles, besides the luminous phosphor. This leads to a considerable improvement in the perceived color and the radiation characteristics of a semiconductor component of this kind, and thus to the solution of the underlying technical problem. The light-scattering particles have a dual function here. First, the increased number of reflections of light beams on the path through the luminescence conversion element leads to an improved blending of the primary radiation let through by the luminescence conversion element and the secondary radiation emitted by the luminous material. Second, the adding of light-scattering particles leads to a more homogeneous distribution of the luminous material around the LED chip.

**BAKER & McKENZIE**

By selecting the luminous material from the group of the phosphors, advantageously the degradation (worsening) of the luminescence conversion element is considerably reduced.

Finally, by embedding the inorganic luminous material in an epoxy resin matrix, it becomes possible to produce the semiconductor components with traditional LED component manufacturing lines in relatively simple manner.

Based on protected claim 17 of the complaint utility model I, one obtains the following analysis of features:

1.  Light-emitting semiconductor component,

2.  with a semiconductor body, which emits electromagnetic radiation during operation of the semiconductor component,

3.  with at least a first and at least a second electrical terminal, which are connected in electrically conducting manner to the semiconductor body, and

4.  with a luminescence conversion element, which has at least one luminous material,

5.  the semiconductor body has a sequence of semiconductor layers, suitable for emitting electromagnetic radiation of a first wavelength region from the ultraviolet, blue and/or green spectral region during operation of the semiconductor component,

**BAKER & MCKENZIE**

6.  the luminescence conversion element transforms a radiation coming from the first wavelength region into radiation of a second wavelength region, different from the first,

7.  the luminescence conversion element lets through at least a portion of the electromagnetic radiation of the first wavelength region,

8.  the semiconductor component emits mixed radiation consisting of radiation of the first wavelength region and radiation of the second wavelength region,

9.  the luminescence conversion element contains light-scattering particles in addition to the luminous material,

10. the luminescence conversion element has at least one inorganic luminous material from the group of the phosphors,

11. the inorganic luminous material is embedded in an epoxy resin matrix.

The above presented feature analysis shall be submitted yet again, separately – and in triplicate for the court – to facilitate the procedure, as

**Exhibit K 9**

Preferred embodiments and further modifications, which are of interest to the present case, are found in protected claims 3, 6, 8, 10 and 15.

2.    <u>Violation of claim 17 of the complaint utility model I</u>

**BAKER & MCKENZIE**

The LEDs sold by the respondents make use in literal fashion of the features of protected claim 17 of the complaint utility model I.

We enclose, as

**Exhibit K 10**

a schematic drawing of the form of infringement.

As

**Exhibit K 11**

we are submitting a polished section of the form of infringement per Exhibit K 5. The picture presented in Exhibit K 11, top, shows the overall semiconductor body, which is covered by the casting material. The picture shown at bottom is an enlarged detail of the region around the right edge of the semiconductor body.

The LED submitted as Exhibit K 5 and represented in the schematic per Exhibit K 10 is a light-emitting semiconductor component (feature 1). In fact, the light emitted by the offending LED is a white mixed light. This is shown already by the respondent using the letter "W" in the designation "CL-270WA-D-TS".

The semiconductor body, which emits electromagnetic radiation during the operation of the semiconductor component, is the light diode chip indicated by the reference number 2 in the schematic (feature 2).

**BAKER & MCKENZIE**

This light diode chip has two electrical connection tracks (3, 4), and the light diode chip (2) is glued onto one of the two connection tracks. Two front-side contacts of the light diode chip (2) are connected in electrically conducting manner to the two connection tracks (3, 4) by means of bonding wires, so that feature 3 is also implemented.

According to feature 4, the LED is supposed to contain a luminescence conversion element with at least one luminous material. In the infringement, the luminescence conversion element is formed from the chip casting material (5), which contains luminous particles (6). The material of the luminous particles of the infringement is a garnet of formula $(Y,Gd)_3Al_5O_{12}:Ce$, doped with rare earth elements, which we shall go into further in connection with the protected rights of II. The chip casting material is an epoxy resin, which is proposed as preferred material in the complaint utility model I.

**Proof**:        expert opinion.

According to feature 5, the semiconductor body should have a sequence of semiconductor layers, suitable to emitting electromagnetic radiation of a first wavelength region from the ultraviolet, blue or green spectral region during the operation of the semiconductor component. This feature is fulfilled as well, since the light diode chip possesses a sequence of gallium nitride layers. Such a sequence of layers, as is known, can emit blue or green light. In the specific instance, the investigations of the plaintiff have revealed that the LED chip emits blue light during operation.

**Proof**:  1. Spectral analyses of the LED of the respondent, **Exhibit K 12**,

        2. Testimony of Mr. Beil, to be called via the plaintiff,

19

3. Expert opinion.

One recognizes the blue light emitted by the LED chip from the first peak in the spectral curve, which lies at a wavelength of around 460 nm. According to the table, enclosed as

**Exhibit K 13**

from the Textbook of Organic Chemistry by Prof. Walter, light with a wavelength of 460 nm is blue.

This blue light from the first wavelength region is, according to feature 6, transformed by the luminescence conversion element into radiation of a second wavelength region, different from the first. The luminous particles (6) of $(Y,Gd)_3Al_5O_{12}$:Ce, located in the chip casting material (5), transform a portion of the radiation emitted by the light diode chip (2) into yellow radiation. One recognizes this in the spectral analysis submitted per Exhibit K 12 from the second peak, which lies at around 580 nm. The light of this wavelength is the secondary radiation emitted by the luminous particles.

**Proof**:  1. Testimony of Mr. Beil, to be called via the plaintiff,

2. Expert opinion.

Yellow radiation has a wavelength region different from blue radiation, so that feature 6 is realized.

The luminescence conversion element lets through at least a portion of the electromagnetic radiation of the first wavelength region (the blue light), without

transforming this into yellow radiation. This is shown by the first peak of the spectral analysis submitted per Exhibit K 12, since the first peak shows untransformed blue light. Thus, feature 7 is fulfilled.

The yellow light emitted by the luminous particles is demonstrated by the second peak in the spectral analysis per Exhibit K 12. Hence, feature 8 is realized, since the LED emits in total a mixture of (blue) radiation of the first wavelength region and (yellow) radiation of a second wavelength region.

Furthermore, the chip casting material (5) contains, besides the luminous particles, also silicon dioxide particles (7). This is shown by an EDX analysis of the chip casting material.

**Proof**:  EDX analysis of the chip casting material of the respondent, enclosed in copy as
          **Exhibit K 14**.

Silicon dioxide particles (7) have no wavelength-converting property, but merely scatter light beams that impinge on them. They are thus light-scattering particles per feature 9 of the feature analysis.

**Proof**:  1. Testimony of Dr. Strauss

          2. Expert opinion.

The garnets of formula $(Y,Gd)_3Al_5O_{12}:Ce$, doped with rare earth elements, are luminous materials from the group of the phosphors (feature 10). Since this inorganic luminous material is embedded in an epoxy resin matrix, feature 11 of the feature analysis is also present.

**BAKER & MCKENZIE**

**Proof**: 1. Testimony of Dr. Strauss

2. Expert opinion.

3.    Violation of protected claims 3, 6, 8, 10 and 15 of the complaint utility model I, each time in conjunction with the features of claims 1, 14 and 17

Since the infringement realizes all features of protected claim 17, there is really no need to go further into the particular portion of the complaint petition. Merely as a precaution, we shall show hereafter that the infringement also makes use of additional features of the protected claims 3, 6, 8, 10 and 15.

According to protected claim 3, the luminescence conversion element is supposed to be arranged essentially after the semiconductor body, looking in the principal direction of radiation of the semiconductor component. The luminescence conversion element in the offending LED is formed by the chip casting material (5) with the luminous particles (6) and the scattering particles (7). In the infringing object, it is placed onto the light diode chip (2) and, accordingly, is arranged after the light diode chip in the principal direction of radiation of the LED component.

According to protected claim 6, the second wavelength region should have at least partially larger wavelengths λ than the first wavelength region. The blue light lying in the first wavelength region lies in a region around the peak wavelength of 460 nm. The light emitted by the luminous particles, on the other hand, lies in a wavelength region around the peak wavelength of about 580 nm (see spectral analysis per Exhibit K 12).

Protected claim 8 is also realized, since blue and yellow light are complementary colors for producing white light. That this is so, follows already from the fact that the offending LED emits white light. But it also results from the CIE diagram submitted as Exhibit K 8.

According to protected claim 10, the radiation emitted by the semiconductor body should have a wavelength of $\lambda \leq 520$ nm. According to the spectral curve submitted as Exhibit K 12, the radiation emitted by the LED chip lies in the region of peak wavelengths of around 460 nm.

Finally, the inorganic luminous material is from the group of cerium-doped garnets, so that protected claim 15 is also fulfilled.

IV.    **Violation of the complaint utility model II and the complaint patent (hereinafter, "protected rights II")**

1.    <u>The teaching of the protected rights II</u>

The above-discussed complaint utility model I proposes the use of a luminescence conversion element, which preferably consists of transparent epoxy resin and is mixed with luminous particles. This is a casting compound. The basic problem underlying the protected rights II consists in further developing the luminescence conversion element, present in the form of the wavelength-converting casting compound, so that it emits homogeneous mixed-color light and enables a mass production with reasonable technical expense with largely reproducible characteristics of the components (cf. Exhibit K 2a, page 2, lines 21 to 28, and Exhibit K 2b, para. [0007]).

BAKER & MCKENZIE

This problem is solved, according to the invention, in that one adds luminous pigments of a particular chemical and physical consistency to the casting compound.

As for the chemical consistency, the luminous pigments proposed according to the protected rights II are inorganic luminous materials that are especially suited for use in LED chips, emitting ultraviolet, blue and/or green light. These inorganic luminous pigments have a crystalline garnet structure. The presence of a garnet structure is enunciated in the protected rights II by the formula $A_3B_5X_{12}$. This is the generally customary formula for a garnet structure. The luminous materials with such a garnet structure are advantageous, because this structure is not given up in the casting compound, i.e., the luminous pigments are distributed in the casting compound, without being dissolved.

The luminous materials are deliberately contaminated (doped) with atoms of the "rare earth" group of elements, in order to generate luminescing centers by this doping with rare earth elements. In this way, the rare earth atoms displace to a slight extent the atoms of the underlying material from their places in the lattice. When these are then stimulated by the electromagnetic irradiation of the LED chip (with primary radiation), they generate the secondary radiation of the invention. Cerium, a rare earth element belonging to the group of the lanthanides, is used with special preference as doping agent.

In regard to the physical structure of the luminous pigments, the teaching of the protected rights II proposes a certain mean grain diameter and a certain grain size. These are important for the converting of the wavelengths of the primary radiation, because they affect the efficiency of the luminescence, the homogeneity of the mixed-color light emitted by the component (consisting of primary and secondary radiation), and the

distribution of the luminous pigments around the LED chip. Specifically, the protected rights II teach in relation to the physical structure of the luminous pigments in the luminescence conversion element that they have grain sizes $\leq 20$ µm and a mean grain diameter $d_{50} \leq 5$ µm. The quantity $d_{50} \leq 5$ µm is a statistical value. It says that, statistically speaking, the grain diameter of half of all luminous pigments used ($d_{50}$) should be smaller than or equal to 5 µm.

The subject of the complaint is light-emitting semiconductor elements, which are prepared with a casting compound per claim 1 of the protected rights II. Starting with protected claim 21 of the complaint patent (or claim 13 of the complaint utility model II), we have the following feature analysis for the device placed under protection:

1. light-emitting semiconductor component

2. with a wavelength-converting casting compound

3. based on a transparent epoxy resin,

4. for an electroluminescing component with a body emitting ultraviolet, blue or green light,

5. in the transparent epoxy resin is dispersed an inorganic luminous pigment powder from the group of the phosphors with the general formula $A_3B_5X_{12}:M$

6. the luminous pigments have grain sizes $\leq 20$ µm and a mean grain diameter of $d_{50} \leq 5$ µm, and

**BAKER & McKENZIE**

7.   with a semiconductor body, which has a sequence of semiconductor layers, suitable for emitting electromagnetic radiation from the ultraviolet, blue and/or green spectral region during operation of the semiconductor component,

8.   the luminous pigments transform a portion of the radiation coming from this spectral region into radiation with larger wavelength, so that the semiconductor component emits mixed radiation, in particular, mixed-color light, consisting of this radiation from the ultraviolet, blue and/or green spectral region.

The above presented feature analysis is submitted yet again, separately – and in triplicate for the court – as

**Exhibit K 15**

in order to facilitate the work.

A preferred embodiment and further modification, which is of interest in the present case, is found in protected claim 22 of the complaint patent or protected claim 14 of the complaint utility model II.

2.   Violation of protected claim 21 of the complaint patent and protected claim 13 of the complaint utility model II

The white light emitting LEDs of the respondents make literal use of all features of protected claim 21 of the complaint patent and protected claim 13 of the complaint utility model II.

**BAKER & MCKENZIE**

The LED of the respondents is a light-emitting semiconductor component (feature 1).

The wavelength-converting casting compound per feature 2 is the chip casting material of epoxy resin, designated by reference number 5 in the schematic drawing (Exhibit K 10), which contains luminous particles (6).

As already explained above, the luminous particles absorb a portion of the radiation of the LED chip (2) and re-emit longer-wave radiation.

The chip casting material consists of epoxy resin, so that feature 3 is also realized.

According to feature 4, the casting material is supposed to be used for an electroluminescing component with a body that emits ultraviolet, blue or green light. The body is the LED chip with the reference number 2 in Exhibit K 10. This, specifically, emits blue light. This results from the spectral analysis per Exhibit K 12. The peak recognizable there at a wavelength of 460 nm shows the intensity maximum of the primary radiation emitted by the LED chip and passing through the luminescence conversion element. Thus, feature 4 is realized.

According to feature 5, the luminous material used should be an inorganic luminous material from the group of the phosphors with the general formula $A_3B_5X_{12}$:M. As already explained above, the formula $A_3B_5X_{12}$ stands for a garnet structure. The symbol "M" indicates a doping. The analyses of plaintiff have revealed that the luminous material used in the offending LED is a so-called yttrium-gadolinium-aluminum garnet of formula $(Y,Gd)_3Al_5O_{12}$. It is doped with cerium. The luminous material with the formula $(Y,Gd)_3Al_5O_{12}$:Ce is an inorganic material. Feature 5 is thus realized.

**BAKER & MCKENZIE**

Furthermore, the infringement also realizes feature 6. The plaintiff had the grain size of the luminous particles in the epoxy resin measured by a computer program (the SPIP program) as well as manually. The SPIP program is a software from the Image Metrology company. During the investigations, the plaintiff made cross sections through ten LEDs, containing the chip casting material with the luminous particles, and measured the individual particles each time. The measurements have shown that the ten LEDs investigated have particle sizes corresponding to feature 6. The plaintiff has entered the results of the measurement of one of the LEDs on the diagram, submitted as

**Exhibit K 16**

From this, one sees that no particle had a grain size greater than 20 μm. In all, 1496 luminous particles were measured. More than 1200 of these luminous particles have a grain diameter of less than 5 μm. This by itself shows that the mean grain diameter $d_{50}$ (= limit below which 50% of all particles lie) must be below 5 μm. The mean grain diameter $d_{50}$ of the luminous particles found from this investigation is approximately 2.9 μm and was thus far below 5 μm.

**Proof**:  1. Testimony of Dr. Strauss, b.b.,

2. Expert opinion.

Dr. Strauss analyzed a total of 10 LEDs of the respondents by this technique, as explained above. The analyses of all 10 LEDs produced the same results.

**Proof**:  Testimony of Dr. Strauss, b.b.,

**BAKER & McKENZIE**

According to feature 7, the LED should have a semiconductor body with a sequence of semiconductor layers, suitable for emitting electromagnetic radiation from the ultraviolet, blue and/or green spectral region during the operation of the semiconductor component. This feature is present as well, since the offending LED has a sequence of semiconductor layers that emits electromagnetic radiation from the blue spectral region during the operation of the semiconductor component (cf. the first peak lying at around 460 nm in the spectral analysis per K 12).

Finally, feature 8 is fulfilled, for the luminous pigments transform a portion of the radiation coming from this spectral region into radiation with larger wavelength, such that the semiconductor component emits mixed radiation, in particular, mixed-color light, consisting of this radiation from the ultraviolet, blue and/or green spectral region. The radiation of greater wavelength transformed and emitted by the luminous pigments is the yellow radiation that was demonstrated by the peak at wavelength of around 580 nm in the spectral analysis per Exhibit K 12.

3.    Violation of protected claim 22 of the complaint patent and protected claim 14 of the complaint utility model II

According to protected claim 22 of the complaint patent (protected claim 14 of the complaint utility model II), the casting compound should enclose a portion of the semiconductor body. The semiconductor body is the light diode chip, designated by reference number 2 in the schematic drawing per Exhibit K 10. This light diode chip is enclosed by the casting compound, which one can recognize from both the schematic drawing and also the polished section per Exhibit K 11.

**BAKER & MCKENZIE**

**V.    Violation of the complaint utility model III**

1.    The complaint utility model III

All of the protected rights of the complaint teach the use of a luminescence conversion element, in which mixed light is generated in that the luminous material absorbs a portion of the primary radiation, transforms [it] into radiation of a second wavelength region (secondary radiation), and emits this secondary radiation once again. The light of the overall semiconductor component, as perceived by an observer, is thus composed of the primary radiation emitted by the LED chip, having passed through the luminescence conversion element but not been converted, and the secondary radiation emitted by the luminous particles (i.e., converted primary radiation), arising through excitation by primary radiation penetrating into the luminescence conversion element and absorbed by the luminous material.

The complaint utility model III deals with the task of providing a semiconductor component of this category that produces homogeneous mixed light. This is the case when the light perceived by an observer is perceived in all directions as being light of the same (mixed) color. In particular, complaint utility model III teaches how the luminescence conversion element must be constructed to fulfill this task.

According to the invention, the complaint utility model III discloses the knowledge that, in order to achieve a homogeneous mixed light, the optical path length of the primary radiation emitted by the LED chip and passing through the luminescence conversion element is approximately identical for all directions of radiation of the semiconductor

component. If this teaching is followed, then in all directions of radiation the probability of the primary radiation being absorbed by a luminous particle and transformed into secondary radiation is approximately the same. In all directions of radiation, thus, an equally sized fraction of primary radiation is transformed into secondary radiation, with the consequence that the (mixed) light emitted by the semiconductor component as a whole and perceived by an observer is homogeneous. The (mixed) light perceived by an observer is composed of a plethora of individual rays. The question as to which optical path length the (mixed) light perceived by an observer has traveled comes down to a statistical treatment taking into account all rays perceived by an observer in the particular direction of radiation.

The optical path length of this primary radiation can be influenced in various ways, as will be explained more closely by means of the drawing, enclosed as

**Exhibit K 17**

The primary radiation emitted by a LED chip does not emerge on a direct path from the luminescence conversion element, but rather is scattered many times inside the luminescence conversion element. This scattering can be accomplished deliberately by so-called light-scattering particles (diffusers), which are the subject of complaint utility model I. Even without the use of such diffusers, however, the rays emitted by the LED chip will be scattered, since not all the primary rays impinging on a luminous particle are absorbed and re-emitted as secondary rays, but instead a portion of these primary rays impinging on luminous particles will merely be deflected (scattered). Now, the complaint utility model III teaches that an approximately identical optical path of the nonconverted primary radiation can be achieved, for example, by a constant thickness of the luminescence conversion layer (cf. Exhibit K3, page 4, lines 25 ff.). But it also teaches

**BAKER & MCKENZIE**

that the thickness of the luminescence conversion layer is no absolute quantity, and instead the optical path length of the primary radiation also depends on the distribution of luminous particles. A nonuniform thickness of the luminescence conversion layer can also be balanced out, according to the invention, by a deliberately inhomogeneous distribution of luminous particles inside the luminescence conversion layer (cf. Exhibit K3, page 6, lines 21 ff.). Thus, the practitioner will take from the complaint utility model III the instruction of making sure, by a suitable choice of the thickness of the luminescence conversion layer and the concentration of luminous particles, that the optical path length of the primary radiation emitted by the LED chip is approximately the same size. If this teaching is followed, then the fundamental task of the complaint utility model III, that of producing homogeneous (mixed) light, will be fulfilled.

What is critical in making sure that the white tone is as uniform as possible in different directions of radiation of the component is the adoption of the technical teaching of the invention, that the primary light passing through the luminescence conversion element has the same optical path length for all directions of radiation of the LED component through the luminescence conversion element. For then the probability that primary radiation will be transformed into secondary radiation on its path through the luminescence conversion element is the same for all directions of radiation. For the larger the path length of the primary radiation through the luminescence conversion element, the more of this primary radiation will be transformed into secondary radiation on this path, and therefore the less primary radiation gets through the luminescence conversion element unconverted. If the path lengths were different in various directions of radiation of the component, the mixed light emitted in the different directions of radiation would consequently also have different color tones. To illustrate the above-discussed state of affairs, a drawing is enclosed as

**BAKER & McKENZIE**

**Exhibit K 18**

This shows two observations points A and B to represent different directions of radiation. If the path length of the blue primary light arriving at observation point A through the luminescence conversion element were greater than the path length of the blue primary light arriving at observation point B, the yellow proportion of the total light at observation point A would be greater than that at observation point B. A different color tone would then be seen at observation point A than at observation point B.

Starting from protected claim 17 of the complaint utility model III, we have the following analysis of features for the device placed under protection:

1. Light-emitting semiconductor component,

2. with a semiconductor body, which emits electromagnetic radiation during operation of the semiconductor component,

3. with at least a first and at least a second electrical terminal, which are connected in electrically conducting manner to the semiconductor body, and

4. with a luminescence conversion element, which has at least one luminous material,

5. the semiconductor body has a sequence of semiconductor layers, suitable for emitting electromagnetic radiation of a first wavelength region from the ultraviolet, blue and/or green spectral region during operation of the semiconductor component,

**BAKER & MCKENZIE**

6.  the luminescence conversion element transforms a radiation coming from the first wavelength region into radiation of a second wavelength region, different from the first,

7.  the luminescence conversion element lets through at least a portion of the electromagnetic radiation of the first wavelength region,

8.  the semiconductor component emits mixed radiation consisting of radiation of the first wavelength region and radiation of the second wavelength region,

9.  a path length of the electromagnetic radiation of the first wavelength region emitted by the semiconductor body through the luminescence conversion element is approximately identical for all directions of radiation,

10. the luminescence conversion element has at least one inorganic luminous material from the group of the phosphors,

11. the inorganic luminous material is embedded in an epoxy resin matrix.

The above-presented feature analysis shall be submitted yet again, separately – and in triplicate for the court – to facilitate the procedure, as

**Exhibit K 19**

Preferred embodiments and further modifications, which are of interest to the present case, are found in protected claims 3, 6, 8, 10, 15 and 22.

2.  <u>Violation of claim 17 of the complaint utility model III</u>

`

**BAKER & McKENZIE**

The LEDs sold by the respondents also make use in literal fashion of the features of protected claim 17 of the complaint utility model III.

To avoid repetition, we refer to the features analysis for complaint utility model I. Features 1 to 8 of complaint utility model III are identical to the features of complaint utility model I, so that their violation follows from the grounds presented above. The same holds for features 10 and 11.

By feature 9 of the complaint utility model III, the path length of the electromagnetic radiation of the first wavelength region (the primary radiation) emitted by the semiconductor body through the luminescence conversion element is supposed to be approximately identical for all directions of radiation. The plaintiff has determined the so-called Chromaticity Point from all directions of observation of a LED.

**Proof**: Table of chromaticities of a LED of the respondents, enclosed in copy as **Exhibit K 20.**

It results from the presented table that the chromaticity of the perceived light over the entire region of a LED lies on the so-called CX coordinate of the CIE diagram (cf. Exhibit K 6) between 0.309 and 0.326, and on the CY coordinate between 0.314 and 0.338. It follows from the CIE diagram, presented as Exhibit K 8, that this is white light. This white light is also homogeneous, thanks to the closely spaced chromaticities of the perceptible mixed radiation. Respondent 1 itself defines homogeneous white light as being light in which the chromaticities of the mixed radiation perceivable over the entire region of a LED lie in a particular region that is specified by several coordinates, as is made clear by the diagram submitted as

**Exhibit K 21**

The region defined as a homogeneous region is delimited there. The chromaticities of the offending LEDs, as measured by the plaintiff and characterized by the triangles and squares, lie within this delimited region. The white mixed light emitted by the offending LED of the respondents is therefore homogeneous.

**Proof**:  Expert opinion.

The condition for light being perceived as homogeneous light is that the blue radiation is transformed into yellow light with the same probability, statistically speaking, in all directions. It follows, conversely, that the primary radiation emitted by the LED chip passes unconverted as blue light through the luminescence conversion element. Now, this is assured if the optical path lengths of the blue radiation inside the luminescence conversion element are approximately the same for all directions of radiation, statistically speaking. Otherwise, different quantities of blue radiation would be transformed into yellow radiation in different directions. Depending on the viewing angle, the (mixed) radiation perceived by the observer would appear more yellow or more blue. Since this is not the case, feature 9 must also be realized in the offending LED.

**Proof**:  Expert opinion.

3.    <u>Violation of protected claims 3, 6, 8, 10, 15 and 22 of the complaint utility model III</u>

Furthermore, the infringement also makes use of the additional features of protected claims 3, 6, 8, 10, 15 and 22.

**BAKER & MCKENZIE**

By protected claim 3 of the complaint utility model III, the luminescence conversion element looking in the direction of the principal radiation of the semiconductor component should be arranged essentially after the semiconductor body. That this is so, we have already explained on page 19 in connection with the complaint utility model I.

Protected claim 16 is likewise realized, since the second wavelength region has at least partly larger wavelengths $\lambda$ than the first wavelength region. The secondary radiation is yellow light in a wavelength region about the peak wavelength of 580 nm. The first wavelength region of the blue light lies, on the other hand, at the peak wavelength of 460 nm.

Blue and yellow light lie in mutually complementary-color spectral regions, so that white light is produced (protected claim 8).

At the same time, protected claim 10 is realized, since the primary radiation emitted by the semiconductor body lies at a wavelength of 460 nm, and thus has an intensity maximum with $\lambda \leq 520$ nm.

The luminescence conversion element has at least one inorganic luminous material from the group of the Ce-doped garnets, namely, a so-called yttrium-gadolinium-aluminum garnet of formula $(Y,Gd)_3Al_5O_{12}:Ce$. Therefore, protected claim 15 is realized.

Finally, the luminescence conversion element also contains light-scattering particles, namely, silicon dioxide particles. Consequently, protected claim 22 is also infringed.

BAKER & MCKENZIE

## VI.    Legal assessment

The asserted injunctive relief claims are established by § 24 Para. 1, 11 Para. 1 Clause 2 GebMG and § 139 Para. 1, 14 PatG. The asserted claim for indemnification follows from § 24 Para. 2 GebMG and § 139 Para. 2 PatG. Without more knowledge as to the extent of the infringement actions, plaintiff cannot put a figure on the amount of its damage claim. It is therefore entitled to assert its claim for information and reckoning per § 24b GebMG and § 140b PatG. The claim for destruction follows from § 24a GebMG and § 140a PatG. The indemnification claim asserted in regard to the complaint patent follows from § 33 PatG.

The respondents are offering the offending LEDs for sale throughout Germany, so that the court appealed to also holds jurisdiction.

The LED sales of the plaintiff are in the many millions. We therefore consider it appropriate to place a value of EUR 5 million on this case.

We point out that the patent attorneys of Epping Hermann Fischer Patentanwaltsgesellschaft mbH, Ridlerstrasse 55, 80339 Munich, are collaborating on the plaintiff's side.

Dr. Günter Pickrahn